*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 28, 2020

Plaintiff-Appellee,

v

No. 346615
Shiawassee Circuit Court
LC No. 2018-002843-FC

MICHAEL DOUGLAS BROOKS,

Defendant-Appellant.

Before: SWARTZLE, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Michael Brooks, appeals as of right his jury trial conviction of first-degree criminal sexual conduct, MCL 750.520b(1)(a) (victim under 13 years of age). On November 16, 2018, the trial court sentenced Brooks as a fourth-offense habitual offender, MCL 769.12, to a prison term of 50 to 75 years. Because there are no errors warranting reversal, we affirm Brooks's conviction and sentence.

## I. BASIC FACTS

Brooks was charged with digitally penetrating then 10-year-old MS on July 30, 2017. At trial, MS testified that on July 29, 2017, her friend MM came over with a lot of other people, including many adults, to celebrate a local car festival. After the festivities, MS, her sister HS, and MM, went into the living room to sleep. MS and MM shared the big couch, with their heads at opposite ends and their feet meeting in the middle. HS slept on the small couch.

MS testified that she woke when Brooks came inside to get the dog and take him for a walk. Later, MS and the two other girls woke up when Brooks came into the living room for a second time to look for his phone. MS fell back asleep. She testified that she was awakened for a third time when Brooks came in from the garage, sat on the big couch, picked up her feet, and

-1-

began massaging them. She said that Brooks reached over and touched her vagina. She described feeling the pressure from his finger inside her vagina. MS kicked Brooks, so he got up and left.[1]

MS ran to her mother, who was asleep in her bedroom. MS's mother testified that she was awakened by MS, who was distraught, crying, and very upset.[2] MS's mother testified that she asked, "What's the matter," and MS, said "Mike [Brooks]." When asked "What about Mike," MS stated that Brooks, "did to me what Hunter did to my Aunt Kylie."[3] MS's mother added that MS "told me that [Brooks] put his fingers in her vagina." After telling her fiancé, Carl Brooks, about MS's disclosure, MS's mother called the police. Brooks was arrested and charged with one count of first-degree criminal sexual conduct.

Before trial, the prosecution filed a motion to admit other-acts testimony from three women who were sexually assaulted by Brooks when they were minors. Initially, the prosecution sought admission under MRE 404(b), but after it became clear that all of witnesses were minors when they were assaulted the prosecution requested admission under MCL 768.27a. At an evidentiary hearing three women testified: Brooks's sister, Theresa Jackson; Brooks's ex-girlfriend, Loretta Knight; and Skylir Maloney, an acquaintance of Knight. Following the hearing, the trial court concluded that Jackson and Knight's testimony was admissible under MCL 768.27a and MRE 404(b) and that Maloney's testimony was admissible under MCL 768.27a.

At trial, Jackson testified that when she was approximately 10 years old Brooks started coming into her bedroom at night while she was asleep and she would awaken to him touching her in her "private areas." She described that he would lift her nightie or t-shirt and lower her underwear while she was sleeping and then would leave the room when she was fully awake. In the beginning Brooks would touch her breasts and "crotch" through her clothing, but it progressed to the point where he would make circular motions on the outside of her vagina with his hands and fingers. She stated that Brooks continued to molest her until she was approximately 12 years old.

Knight testified sometime after she met Brooks she fell asleep in a hotel room with Brooks and another individual. She testified that she woke up with her pants down and Brooks putting either his penis or his fingers into her vagina. Knight was 17 at the time of the assault and Brooks was 42. Knight did not tell anyone about the incident, and when she was 18 or 19 she began dating Brooks, and the relationship continued for approximately five years.

During that time, Knight witnessed an incident between Brooks and Maloney. Maloney testified that when she was 15 years old she got a ride from Knight. Brooks was in the front passenger seat and she was in the backseat on the driver's side. Maloney stated that Brooks reached into the backseat and touched her inner thigh and vaginal area over her clothing. The palm of his hand touched her thighs and his fingers touched her vagina over her clothes. Maloney asked, "What the hell are you doing?" and yelled Knight's name. In response, Knight looked back and

---

[1] HS testified that she saw Brooks get off the couch and run out the door.

[2] MM and HS also testified that MS was crying when she went to her mother's room.

[3] MS's mother testified that she already knew the story about what "Hunter" did to MS's aunt, so she did not need MS to elaborate. She later indicated that Hunter had "fingered" MS's aunt.

then punched Brooks in the face. Knight recalled hearing Maloney say "What the hell are you doing?" and "Get your hands off me." Knight testified that it "clicked" what Brooks was doing to Maloney, and she yelled at him, "She's fucking 15; what are you doing?"

Brooks denied any wrongdoing. He testified that although he woke MS to find his phone, he did not sit on the couch, did not massage MS's feet, and did not finger her "privates." He denied having nonconsensual sex with Knight and stated that the incident described by Maloney and Knight never happened. Finally, he testified that he never sexually "violated" Jackson when they were young.

## II. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

Brooks argues that the trial court abused its discretion by admitting the testimony from the other-acts witnesses. "The decision whether to admit evidence falls within a trial court's discretion and will be reversed only when there is an abuse of that discretion." *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*. at 722-723.

### B. ANALYSIS

The trial court admitted the testimony from each other-acts witness under MCL 768.27a.[4] The purpose of the statute is to broaden the range of evidence admissible in cases where the defendant is charged with a sexual offense against a minor. *People v Smith*, 282 Mich App 191, 204; 772 NW2d 428 (2009). MCL 768.27a(1) provides, in relevant part, "[i]n a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." Evidence introduced under the statute may be considered for any relevant matter, including "the likelihood of a defendant's criminal sexual behavior toward other minors." *People v Pattinson*, 276 Mich App 613, 620; 741 NW2d 558 (2007).

Here, Jackson testified that on many occasions when she was between 10 and 12, Brooks touched her breasts and her vagina. These prior acts by Brooks constitute a "listed offense" of second-degree criminal sexual conduct against a person under 13 years of age. See MCL 750.520c. Knight testified that when she was 17 years old she awakened and discovered Brooks's finger or penis inside her vagina. This prior act by Brooks constitute a "listed offense" of third-degree criminal sexual conduct. See MCL 750.520d. Finally, Maloney testified that Brooks touched her thigh and vagina over her clothing when she was 15 years old. This prior act by Brooks constitutes the "listed offense" of fourth-degree criminal sexual conduct, MCL 750.520e Because the prior

---

[4] The court also found that Jackson and Knight's testimony was admissible under MRE 404(b). However, in cases where MCL 768.27a applies it supersedes MRE 404(b). *People v Watkins*, 491 Mich 450, 476-477; 818 NW2d 296 (2012). Accordingly, we need not determine whether the trial court erred by also admitting the testimony under MRE 404(b).

acts constituted listed offenses against minors, and because the charge in the instant case was a listed offense against a minor, the other-acts evidence is admissible under MCL 768.27a(1).

Brooks contends that because of dissimilarity between the charged act and the other acts alleged by Knight and Maloney, no propensity inference can be drawn for those other acts. He believes that, in the absence of a propensity inference, their other-acts testimony is not admissible under MCL 768.27a(1). In support, he highlights the differences between the acts, but minimizes the similarities, which are striking. First, in all three incidents Brooks touched a minor female's vagina. With MS and Knight, he penetrated their vaginas after approaching them while they were sleeping in rooms where at least one other person was sleeping. With Maloney he used his fingers to touch her vagina over her clothes while she was seated behind Knight in a vehicle. Contrary to Brooks's argument on appeal, the similarities allow for a propensity inference.[5]

With regard to Jackson, Brooks argues that no propensity inference can be drawn from Jackson's testimony because they were both minors when he sexually assaulted her. He directs this Court to a number of articles and caselaw suggesting, in essence, that the criminal acts of an adolescent sex offender cannot be used to predict the child offender's propensity to commit further sexual crimes as an adult. As a result, he argues that evidence that a defendant sexually assaulted a minor while the defendant was also a minor must be categorically excluded from admission at a trial when the defendant is an adult accused of molesting a minor.

Brooks's argument is without merit. The authorities cited by Brooks do not provide that in *all* cases where a juvenile sex offender victimizes a minor child the offender will not sexually assault another minor after the offender becomes an adult. The cited authorities merely provide a basis for a factfinder to reject any propensity inference arising from the evidence. Alternatively, a factfinder could determine that Brooks's act of sexually assaulting his sister when they were both minors increases the likelihood of his criminal sexual behavior toward other minors, including MS. Stated differently, because a jury presented with the so-called "scientific, empirical" evidence cited in Brooks's brief on appeal could nevertheless find that this particular defendant did, in fact, have a propensity to sexually assault minors, we conclude that Brooks's argument goes to the weight of the evidence, not to its admissibility. We, therefore, reject Brooks's invitation to judicially amend MCL 768.27a(1) to categorically exclude from an adult defendant's trial evidence that the defendant, when he or she was a minor, committed a listed offense against a minor.

Still, although evidence may be admissible under MCL 768.27a(1) that evidence is still subject to exclusion under MRE 403. *Watkins*, 491 Mich at 481. Brooks argues that even if the other-acts evidence from Jackson, Knight, and Maloney was admissible under MCL 768.27a(1), the trial court abused its discretion by not excluding that evidence under MRE 403. "[W]hen applying MRE 403 to evidence admissible under MCL 768.27a, courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Watkins*, 491 Mich at 487. Evidence must be excluded under MRE 403 "when the danger of unfair prejudice substantially outweighs the probative value of the evidence." *People v Brown*, 326 Mich App 185,

---

[5] Moreover, even if no propensity inference could properly be drawn, MCL 768.27a(1) expressly provides that the evidence "may be considered for its bearing on *any* matter to which it is relevant." (Emphasis added).

-4-

192; 926 NW2d 879 (2018) (quotation marks and citation omitted). "The determination whether the probative value of evidence is substantially outweighed by its prejudicial effect is best left to a contemporaneous assessment of the presentation, credibility and effect of the testimony." *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009). When making an admissibility determination under MRE 403, the trial court may consider the following nonexhaustive list of factors:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Watkins*, 491 Mich at 487-488.]

Brooks argues that Jackson's testimony should have been excluded under MRE 403. The court weighed the first factor, the dissimilarity between the acts, in favor of admission, noting that there was a "high degree of similarity" between the acts alleged by Jackson and the charged act. Indeed, the acts are remarkably similar. Brooks approached both girls while they were sleeping when they were 10 years old, and he touched their vaginas with his fingers. When they fully awakened, he left.

Despite acknowledging the similarity "might not preclude the admissibility of the testimony,"[6] Brooks argues that the temporal proximity of the other acts to the charged act "weighs heavily against admissibility." There is at least a 35-year gap between the other acts alleged by Jackson and the charged act. A temporal divide, however, standing alone does not automatically preclude admission of the other-acts evidence. *People v Solloway*, 316 Mich App 174, 195; 891 NW2d 255 (2016). In *Solloway*, the temporal gap between the charged act and the prior act was 12 years, but the acts were similar. *Id*. at 195. Although the gap is significantly longer in this case, the principal from *Solloway* is that the passage of time is not dispositive. Instead, "[t]he remoteness of the other act affects the weight of the evidence rather than its admissibility." *People v Brown*, 294 Mich App 377, 387; 811 NW2d 531 (2011).

In this case, the trial court considered the length of time as a factor weighing *against* admissibility. The court contrasted the 35-year gap with the high-degree of similarity between the prior act alleged by Jackson and the charged act. Moreover, the record reflects that although there was a lengthy gap between the acts, Brooks was imprisoned for a considerable amount of that time, roughly 22 years, between the prior assaults involving Jackson and when he assaulted MS.

---

[6] Brooks notes that the "other claims—the spying and so forth" were dissimilar, but he does not expand upon this assertion. Nonetheless, Brooks challenges the trial court's decision at the October 2, 2018 evidentiary hearing. At that hearing, the trial court agreed that the incidents of Brooks wanting Jackson to watch him masturbate, Brooks peeping at Jackson while she was showering, and Brooks allowing his friends to peep at Jackson while she was dressing, were not similar for purposes of the hearing.

Nothing in the record shows that Brooks reformed his behavior between committing the acts. Indeed, Brooks was apparently last released from prison in 2007, and he sexually assaulted Knight around 2010 and Maloney in 2012 or 2013. The temporal gap, therefore, does weigh against a finding of admissibility, but standing alone it does not render the court's decision to admit the evidence an abuse of discretion.

Brooks does not challenge the trial court's decision to weigh the frequency of the prior acts in favor of admissibility, and given that Jackson testified that it occurred on many occasions, this factor weighs in favor of admissibility. Brooks also asserts that the "intervening event of 35-years should" preclude admission of Jackson's other-acts evidence. Yet, despite noting that in that timeframe he spent a significant period of time in and out of prison, he does not direct this Court to any evidence suggesting that the "intervening acts" could have affected his propensity to commit the current charged acts.

Brooks argues, however, that the other-acts evidence lacks reliability because Jackson lacked credibility because (1) she never told anyone about the other acts; (2) she maintained a relationship with him into adulthood, including telling him about a sexual assault committed on her by their father; (3) and because she had a financial interest in seeing him convicted. Jackson's credibility is relevant to determining the reliability of the other-acts evidence. However, although this factor could weigh against the admission of Jackson's other-acts testimony, it can also weigh in favor of admission of the evidence. Here, the court found Jackson's testimony credible, but also recognized that the credibility of the testimony would ultimately be a matter for the jury to determine at trial as opposed to a valid reason to deny admission of the evidence. We discern no abuse of discretion in that determination.[7]

With regard to the need for additional evidence beyond the victim's and the defendant's testimony, Brooks correctly notes that criminal sexual conduct charges need not be corroborated. Yet, when weighing the probative value of other-acts evidence, courts should consider the extent to which the other-acts evidence supports the victim's credibility and rebuts any defense attack on the victim's credibility. *Watkins*, 491 Mich at 491-492. Here, Brooks attacked MS's credibility as part of his defense. Therefore, although not strictly necessary, evidence of Brooks's sexual assaults against Jackson lent credibility to MS's testimony.

Next, Brooks argues that Knight's other-acts testimony should have been excluded under MRE 403. This time he suggests that the dissimilarity between the prior act involving Knight and the charged conduct warrants exclusion. Yet, the acts were quite similar. Knight testified that she was sleeping in a hotel room where Brooks and another individual were present. She was asleep

---

[7] Brooks suggests that the court's comments indicate that it did not believe the reliability of the other-acts evidence was relevant to its analysis under MRE 403. We do not agree. The court's ruling makes clear that it considered the reliability of the evidence, determining that it was reliable enough to submit to a jury, which would act as the ultimate factfinder. Moreover, the factors identified in *Watkins* are factors that a trial court *may* consider. *Watkins*, 491 Mich at 487-488. Because consideration of the factors is not mandatory, even if the court did not consider the reliability of the evidence as part of its MRE 403 analysis, that would not automatically mandate a reversal of the court's discretionary evidentiary decision.

and awakened to find Brooks penetrating her vagina with either his fingers or his penis. Brooks contends that the other act was dissimilar to the charged crime because digital penetration of a 10-year-old minor is distinct from digital or penile penetration of a "17-year-old girlfriend." Brooks's factual assertion is misplaced as Knight testified that she did not enter into a dating relationship with defendant until she was 18 or 19 years old. Furthermore, although Knight was 17 and MS was only 10, both incidents involved Brooks approaching a sleeping minor and penetrating her vagina while in a room where multiple people were present. There is no abuse of discretion in the court's determination that the acts were similar and that their similarity favored admissibility, not exclusion in this case.

Brooks suggests that the temporal proximity between the other-acts evidence alleged by Knight and the charged conduct, when coupled with the dissimilarity of the acts, weighs against admission. The temporal gap, however, is only eight years, and contrary to his assertions, the conduct alleged is remarkably similar. Consequently, the temporal divide between their occurrences does not preclude the evidence's admission. Likewise, with respect to the infrequency of the other acts, Brooks contends that Knight's allegation is similar to the "one-time occurrence" that this Court in *Solloway* indicated would likely preclude admission of the evidence. In *Solloway*, the Court noted that the other-acts witness testified that the "defendant touched him inappropriately multiple times; it was not a one-time occurrence." *Solloway*, 316 Mich App at 195. While *Solloway* suggests that a one-time occurrence would weigh against admissibility, the infrequency of the acts does not preclude admission of the evidence. Here, the trial court acknowledged that the abuse was infrequent, but because it considered the similarity, the temporal proximity, and the reliability of the other-acts evidence more significant, it did not exclude the evidence merely because it was an infrequent occurrence. That determination did not amount to an abuse of discretion.

Brooks does not identify any intervening acts weighing against the admission of Knight's other-acts testimony. And although he argues that there is a lack of reliability regarding Knight's testimony because she later dated him for about five years and because all three other-acts witnesses knew each other, he fails to explain why Knight's relationship with him at a time after the nonconsensual sexual abuse renders her testimony unreliable. Knight's testimony appears reliable, and the trial court found Knight to be credible and, like its ruling with respect to Jackson's testimony, it determined that the jury would be the ultimate determiner of credibility. This factor does not weigh against admissibility of the evidence. Lastly, Brooks argues, as he did with respect to Jackson's testimony, that criminal sexual conduct charges need not be corroborated and that Knight's testimony was not required. Yet, evidence of Brooks's sexual assault against Knight lent credibility to MS's testimony.

With respect to Maloney's other-acts testimony, Brooks contends that touching a 15-year-old over her clothing in the presence of an adult is not similar to touching a 10-year-old who is asleep in the presence of others who are asleep. Although Knight was also in the car, she was the driver and had her back to Maloney. Brooks reached into the backseat and down to Maloney's groin, an area not within Knight's line of vision. He touched Maloney in her thigh and vaginal area. Although—as acknowledged by the trial court—there are some differences, the similarity between the incidents weighs in favor of admissibility. Moreover, given that the acts are similar, the five-year gap in time is less significant than Brooks believes.

Brooks concedes that there are no intervening acts, but he challenges the frequency of the other act. Yet, Maloney did not reside with Brooks, so he did not have continuous exposure to her. Therefore, the infrequency of the other acts does not weigh heavily in favor of excluding the evidence. Brooks also argues that the evidence ought to be excluded because Maloney failed to report the incident and because the three other-acts witnesses knew each other. However, neither of these considerations undermine the reliability of Maloney's testimony. Lastly, for the reasons explained above, evidence of Brooks's sexual contact with Maloney lent credibility to MS's testimony, notwithstanding the fact that her testimony was not essential to prove the charged act occurred.

Based on the foregoing, the trial court did not abuse its discretion by admitting the other-acts testimony from Jackson, Knight, and Maloney under MCL 768.27a. "At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome[.]" *People v Norfleet*, 317 Mich App 649, 664; 897 NW2d 195 (2014) (quotation marks and citation omitted). So, "[w]hen the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment." *Id.* (quotation marks and citation omitted). Because the trial court's principled and rationale reasons for admitting the other-acts testimony were supported by the record, the fact that the court could have weighed the evidence differently and reached a different principled and rationale result does not constitute an abuse of discretion.

Moreover, with respect to the testimony from Jackson, Knight, and Maloney, the trial court instructed the jury to find that Brooks actually committed the acts against Jackson, Knight, and/or Maloney before it could use those acts, and reminded the jury that it could only convict Brooks based upon his conduct with MS. "Jurors are presumed to follow their instructions." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Consequently, the trial court minimized the potential for unfair prejudice by providing the jury with instructions on how to properly use the other-acts evidence. *People v Pesquera*, 244 Mich App 305, 320; 625 NW2d 407 (2001) ("The limiting instruction given to the jury also served to limit the danger of unfair prejudice by restricting use of the evidence.").

## III. ADJOURNMENT

### A. STANDARD OF REVIEW

Brooks contends that the trial court abused its discretion in denying a lengthier adjournment so that Brooks could adequately prepare for trial after the court determined the other-acts witnesses could testify. We review for an abuse of discretion a trial court's decision to grant or deny an adjournment. *People v Jackson*, 467 Mich 272, 276; 650 NW2d 665 (2002).

### B. ANALYSIS

MCR 2.503(B)(1) provides that, "[u]nless the court allows otherwise, a request for an adjournment must be by motion or stipulation made in writing or orally in open court based on good cause." MCR 2.503(D)(1) provides that a court may, in its discretion, "grant an adjournment

to promote the cause of justice." In *People v Coy*, 258 Mich App 1, 18; 669 NW2d 831 (2003), this Court explained:

> [T]o invoke the trial court's discretion to grant a continuance or adjournment, a defendant must show both good cause and diligence. "Good cause" factors include whether defendant (1) asserted a constitutional right, (2) had a legitimate reason for asserting the right, (3) had been negligent, and (4) had requested previous adjournments. [Quotation marks and citations omitted.]

Brooks argues that a lengthier adjournment was required because "three new witnesses appeared a mere 18-days before trial." However, in his first motion for an adjournment, he did not request an adjournment of any specific length. The court adjourned the trial from October 2 to October 9, noting that the prosecution had become aware of the other-acts witnesses within the last week and that Brooks's lawyer needed time to "process and get ready to go." Brooks's lawyer raised no objection to the length of the adjournment. Consequently, there is no reversible error relating to the original adjournment request.

Brooks's lawyer made a second motion for an adjournment on the morning of the trial, arguing that he was not prepared and that good cause existed for an adjournment under MCR 2.503(B) and (C) because of the late addition of the witnesses and because he had just received the 140-page transcript of the evidentiary hearing the night before trial and did not have a chance to fully read it. Yet, the request for an adjournment was made at the last minute and was based on speculation that, with additional time, he could provide effective assistance but without it his performance would be constitutionally ineffective. He identified certain areas that he wanted additional time to explore with Jackson's testimony, but as noted by the trial court, based on his comments, those areas had, in fact, been investigated. There is no indication that additional time would have revealed any additional information regarding Jackson. Brooks's lawyer did not identify any particular areas that warranted further investigation regarding Knight and Maloney. What he requested then, was a last-minute adjournment for an uncertain period of time to search for potential evidence to challenge the other-acts witnesses. Because he did not show the good cause or diligence necessary for an adjournment, the trial court did not err by denying his motion.

Moreover, even if good cause and due diligence existed, Brooks is unable to demonstrate prejudice. Because of the initial adjournment, Brooks's lawyer had access to the other-acts witnesses before trial. He was, in fact, able to extensively cross examine each witness while she was under oath at the evidentiary hearing. Although the transcript of that hearing was not immediately provided, because he was the individual who conducted the cross examination, he had an underlying familiarity with the substance of their testimony so as to better challenge their credibility at trial. Reversal is, therefore, not warranted on this basis. See *Coy*, 258 Mich App at 18-19 ("Even with good cause and due diligence, the trial court's denial of a request for an adjournment or continuance is not grounds for reversal unless the defendant demonstrates prejudice as a result of the abuse of discretion.").

-9-

## IV.  LIMITATION OF CROSS EXAMINATION

### A.  STANDARD OF REVIEW

Brooks argues that the trial court erred by improperly limiting his ability to question Carl Brooks.[8]  "Preserved evidentiary rulings are reviewed for an abuse of discretion." *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008).

### B.  ANALYSIS

Brooks's lawyer asked Carl whether Child Protective Services (CPS) had been to his home before, and Carl said yes.  When Brooks's lawyer asked whether CPS was there because of fear related to the children's safety, the prosecutor objected and the court sustained the objection.  On appeal, Brooks argues that the trial court erred by preventing him from asking Carl about the CPS records because those records *might have* shown that MS made untrue accusations of sexual assault before.  However, Brooks's argument, both at trial and on appeal, is speculative, and he makes no offer of proof with respect to what the excluded testimony would have revealed.  Indeed, as the trial court noted, CPS could have been called to the home for a myriad of reasons unrelated to sexual abuse.  As a result, we conclude that the trial court did not abuse its discretion by sustaining the prosecution's objection.

Next, Brooks argues that the trial court erred by precluding evidence that MS's biological father was a sex offender.  He argues that the evidence was relevant because MS's biological father could have assaulted MS in the past and would have provided an alternate explanation for MS's understanding of adult sexuality and why she accused Brooks.  However, the record reflects that the trial court did not preclude Brooks from introducing evidence that MS's biological father was a sex offender.  Rather, the court ruled that the evidence would not be relevant unless Brooks could establish that MS had been exposed to her biological father.  The court did not forbid Brooks from eliciting such testimony; it stated that if such information were elicited from any witness, then the court would hold a hearing outside the presence of the jury to determine whether Brooks's lawyer could "question whomever you were questioning regarding convictions of CSC."  Accordingly, there is no error.

## V.  SUPPORT DOG

### A.  STANDARD OF REVIEW

Brooks next argues that his due-process rights were violated because during MS's testimony a support dog and the support dog's handler sat near her.  This Court reviews de novo issues of statutory interpretation.  *People v Gardner*, 482 Mich 41, 46; 753 NW2d 78 (2008).  Whether a procedure violates a defendant's due-process right to a fair trial is also reviewed de novo.  *People v Swilley*, 504 Mich 350, 370; 934 NW2d 771 (2019).

---

[8] Carl is Brooks's cousin and is MS's mother's fiancé.  He lives in MS's home.

## B. ANALYSIS

Before MS's testimony, the court instructed the jury that MS would be accompanied by a support animal and that the use of the support animal was authorized by law. The court told the jury that it "[s]hould disregard the support animal's presence and decide the case solely on the evidence presented. You should not consider the witness' testimony to be any more or less credible because of the animal's presence. You must not allow the use of a support animal to influence your decision in any way." During MS's testimony, she became upset by a question and the court took a brief recess. During the recess, the support dog's handler asked the court if it would be all right to "put a chair up here, or not?" Brooks's lawyer objected on the ground that it would be judged to be too prejudicial. However, the court determined that it would let the handler "put a seat in between the bench and the Court Recorder's station, and I don't think anybody will see her. So, let's set up a chair." The record reflects that the handler was "seated near the witness stand" before the jury was brought in.

On appeal, Brooks acknowledges that this Court held in *People v Johnson*, 315 Mich App 163, 178; 889 NW2d 513 (2016), that it is within a trial court's inherent authority to control its courtroom and the proceedings before it to allow a witness to testify while accompanied by a support animal. At the time of the decision in *Johnson*, MCL 600.2163a(4) only allowed a support *person* to accompany a witness. *Johnson*, 315 Mich App at 175. The *Johnson* Court held that, although the statute permitted the use of a support person to accompany a witness, the trial court had inherent authority to control courtroom procedure and allow a support animal "to ease the situation for a traumatized or fearful young witness while at the same time allowing the jury and the defendant to view the witness while testifying." *Id.* at 177-178.

Thereafter, the Legislature amended MCL 600.2163a(4), effective September 27, 2018, see 2018 PA 282, to provide for the use of both support persons and support dogs with their handlers, but limited their use to witnesses under the age of 16, over the age of 16 with a developmental disability, or a vulnerable adult. Statutes that "operate in furtherance of a remedy or mode of procedure" and that "neither create new rights nor destroy, enlarge, or diminish existing rights are generally held to operate retrospectively absent a contrary legislative intent." *People v Kolanek*, 491 Mich 382, 405; 817 NW2d 528 (2012) (quotation marks and citation omitted). MCL 600.2163a is a procedural statute that affords witnesses certain protections. It does not create new rights nor destroy, enlarge, or diminish existing rights. Accordingly, we conclude that it operates retroactively.

The amended statute provides:

> The court must permit a witness who is called upon to testify to have a support person sit with, accompany, or be in close proximity to the witness during his or her testimony. The court must also permit a witness who is called upon to testify to have a courtroom support dog *and handler* sit with, or be in close proximity to, the witness during his or her testimony. [MCL 600.2163a(4) (emphasis added).]

The statute clearly authorized the trial court to allow MS to have a support dog and handler sit with or be in close proximity to her. Brooks has not challenged the constitutionality of the statute.

-11-

Accordingly, as the procedure was authorized by a statute that is presumed constitutional, we discern no error.

## VI.  PROSECUTORIAL ERROR

### A.  STANDARD OF REVIEW

Brooks argues that the prosecutor engaged in prosecutorial error or misconduct when cross-examining Brooks at trial.  "This Court reviews claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).  Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting the defendant's substantial rights. *Id*.  This Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003).

### B.  ANALYSIS

Brooks first argues that the prosecutor erred when he badgered Brooks about his prison record and argued with him over the length of his incarcerations.  During cross examination, the following exchange occurred between the prosecutor and Brooks:

> *Q*:  [You were incarcerated f]or stealing, right?
>
> *A*:  For what?
>
> *Q*:  For stealing.
>
> *A*:  For stealing cars.
>
> *Q*:  Right?  Isn't that true?  You're dishonest—you don't tell the truth.  Isn't that true?
>
> *A*:  No.  I did steal cars.
>
> *Q*:  Oh, you steal cars, but you always tell the truth.  Is that your testimony?
>
> *A*:  No.  My testimony is that I'm not lying, that I did steal cars.
>
> *Q*:  That's not your testimony.
>
> *A*:  No.
>
> *Q*:  So, your testimony is you never lie?  You've never—

On appeal, Brooks argues that the quoted colloquy above was the "paradigm" of an improper "bad character" argument.  However, the jury was already aware that Brooks had a lengthy criminal history involving the theft of cars, a crime involving dishonesty.  As a result, Brooks fails to show how the prosecutor's questions, even if improper, affected his substantial rights.

-12-

Brooks also argues that the prosecutor improperly asked him to "opine on whether prosecution witnesses were lying." The record reflects that the prosecutor asked Brooks whether MS, Jackson, Knight, and Maloney had lied during their testimony. It is "improper for the prosecutor to ask [the] defendant to comment on the credibility of prosecution witnesses" because the defendant's "opinion of their credibility is not probative of the matter." *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985). As a result, the prosecutor erred by asking Brooks whether the prosecution's witnesses were lying in order to discredit Brooks. Nevertheless, "an otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *People v Kennebrew*, 220 Mich App 601, 608; 560 NW2d 354 (1996). Throughout the trial Brooks's lawyer presented the argument that the other-acts witnesses were lying and that MS was either lying or mistaken in her belief that it was Brooks who sexually assaulted her. Therefore, any error in the questioning does not require reversal, because it was responsive to the defense theory that the witnesses were lying. *Id.* Further, a timely objection could have cured the error, *Buckey*, 424 Mich at 17, and in its closing instructions to the jury, the trial court advised the jury that "[Y]ou must decide which witnesses you believe and how important you think their testimony is." Therefore, Brooks cannot establish that the prosecutor's questions affected his substantial rights.

Lastly, Brooks argues that the prosecutor erred when he "dwelled on the age difference between Knight and Brooks when they first had consensual sex." The prosecutor asked Brooks how long he had been out of prison before he started dating Knight. Brooks answered, "Three years, maybe," and then the prosecutor asked him when he got out of prison, and Brooks said that he got out of prison in 2007. The following colloquy then took place between the prosecutor and Brooks:

> *Q.* Okay. So, you didn't meet her until 2010; is that your testimony?
>
> *A.* No. I think my testimony was that I dated her for, like seven months.
>
> *Q.* For seven months.
>
> *A.* I—before I had sex with her.
>
> *Q.* For seven months.
>
> *A.* I—before I had sex with her.
>
> *Q.* Okay.
>
> *A.* Before I entered into a relationship with her.
>
> *Q.* Okay. And when you first met her; how old were you?

Brooks's lawyer objected on the ground of relevance. The court overruled the objection, finding that the evidence was relevant because Brooks's lawyer spent a lot of time asking Brooks about the age of consent and about Knight's age. The court also said that "I think we need to establish Mr. Brooks' age. I think the People do for other reasons; so, I'm going to allow the question." The prosecutor then elicited testimony from Brooks that he was 42 and that Knight was

17 when he entered into a relationship with her. Brooks argues that the questioning "could only unfairly poison the jury" against him and deny him a fair trial. However, Brooks's argument fails to acknowledge that Knight had already testified, without objection, that she was 17 years old and that Brooks was 42 years old on the night of the sexual assault in the motel room. Brooks has failed to show plain error that affected his substantial rights.

## VII. DEADLOCK JURY INSTRUCTION

### A. STANDARD OF REVIEW

Brooks next argues that the court improperly coerced the jury into reaching a verdict by instructing it to continue deliberations after it twice indicated it was at an impasse. A trial court's decision to continue jury deliberations instead of declaring a mistrial because of jury deadlock is reviewed for an abuse of discretion. *People v Shaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). "A trial court should grant a mistrial only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Id*. (quotation marks and citation omitted).

### B. ANALYSIS

Brooks argues that the trial court coerced the jury's verdict by improperly refusing to accept the jury's claim that they were deadlocked. He does *not* argue that the court's deadlocked-jury instructions were coercive. Rather, he contends that the court's refusal to accept the jury's statement that it could not reach a unanimous verdict was coercive. We disagree.

After the parties made their closing arguments and the court instructed the jury on the second day of trial, the jury deliberated for about 25 minutes before telling the court that they preferred to go home for the evening. The following day, the jury deliberated for about 30 minutes before requesting to hear the testimony of Brooks, MS, and MS's mother. The trial court allowed the jury to hear the entirety of each witness's testimony, but instructed it not to deliberate during the playing of the testimony. The jury listened to the testimony beginning around 9:15 a.m. At 2:17 p.m., the court received a note from the jury that said "hung jury."

The court told the parties, outside the presence of the jury, that "in my mind, that's just not good enough—I mean, I think my math tells me they've only deliberated, maybe, for about an hour, considering . . . the time that they spent listening to the transcripts, and lunch, and I don't think they've spent enough time breaking this case down." The court proposed giving the standard deadlocked-jury instruction, M Crim JI 3.12, and both parties agreed. The court told the jury that it computed that the jury had only deliberated for 45 minutes to an hour, and then read the standard jury instruction verbatim.

The jury was sent to deliberate around 2:22 p.m. The court reconvened at 2:44 p.m. and said that it had received another note from the jury. The court read the note on the record:

> Questions/concerns: Was there a physical exam completed on [MS]?
>
> Difficult to decide without forensic interview findings.

-14-

Defense's closing argument alluded to what [MS] was wearing was never brought up—this is one of our roadblocks. What were the girls wearing?

Details missing: Lights on in the house? Did the girls have a blanket?

Huge concern: What did [MS] say? What did Michael say to [MS] that she refused to answer? (Was uncomfortable?)

FYI: We have deliberated on this issue arriving before 8:30, and that included a working breakfast and lunch. We are taking this very seriously, but we are at an impasse.

The trial court proposed reading some additional instructions and giving the jurors another try. The parties agreed with the court's proposal. The court instructed the jury as follows:

I've got your note, and based on the note that you sent out it appears that you're collectively having some difficulty [with] what is evidence.

So, I'm going to re-read a couple of instructions to you and maybe that will hammer home what you've got to do.

I've read your note to counsel and we do know that you're taking this very seriously, and I know what you guys are doing is really tough. I get that. And, again, we all thank you for your time and your effort.

The court reread the standard jury instructions on presumption of evidence, burden of proof, reasonable doubt, and what is and is not evidence. The court then said, "And with that, I'm going to send you back. I think you're doing a great job."

The jury left the courtroom at 2:51 p.m. At 3:48 p.m., the jury sent another note, which the court read into the record:

Hung jury.

Unfortunately, after much deliberations we are at an impasse that I don't believe will be changed. The opinions are strong and there is concern that the prosecutor did not meet his burden of proof by some of the jury members. Without the burden of proof being met, some jurors cannot, in good conscience, say that he is guilty.

However, others believe that the burden of proof has been met.

The court proposed sending the jury home early and to return the next morning to resume deliberations. The prosecutor agreed, but Brooks's lawyer objected and asked the court to declare a hung jury and a mistrial, noting that "this is clearly the second note in two hours that began with the words: Hung Jury." Brooks's lawyer expressed fear that the jury would "go home tonight and the fear of being prejudiced by outside factors, that is a concern at this point." He continued, "I just think that they're at such an impasse that any verdict from hereinafter is going to be tainted, I

-15-

guess, and I would just simply say they're hung." In response, the prosecutor said that Brooks's lawyer had not met the burden for a mistrial and requested they the jury "follow your orders, that you let them deliberate, at least one more time, and wait for their decision." The court denied, the motion, saying, "Well, clearly they are deadlocked at the moment, but let's see if we can't shake that lose [sic] by an evening of rest." When the jury returned at 3:54 p.m., the court said:

> I got your note.
>
> Every single one of you have my respect and I thank you, again, for your service.
>
> So, here's what we're going to do.
>
> Again, you've indicated that you're deadlocked, and I know that you had a long day of deliberations, and I'm going to allow you to leave for the day.
>
> I am, however, going to ask you to return tomorrow to try one more time.
>
> Rest and come back tomorrow at 8:30.
>
> Do not take this case home with you. Just relax, avoid talking about the case or reading about it, and just let it go and let's try it fresh with a fresh mind tomorrow morning.
>
> I'm proud of all of you.
>
> This is the most intense jury I think I've ever seen in my career, and we're just going to try one more time.

At 8:40 the following morning, the court instructed the jury as follows:

> Ladies and gentlemen, I know that this has been difficult, and it is difficult for everyone—there's a lot going on behind the scenes, too, and so we share your frustration, but we appreciate your patience.
>
> In just a moment, I'm going to send you back and ask you to resume your deliberations.
>
> I just want to remind you of the guidelines and please consider them, along with all the other instructions that I've given you over the last few days.
>
> Remember, it's your duty to consult with your fellow jurors to try to reach an agreement if you can do so without violating your own judgment. To return a verdict you must all agree, and the verdict must represent the judgment of each of you. As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness. Naturally, there will be differences of opinion. You should each not only express your

opinion, but also give facts and reasons upon which you base it. By reasoning the matter out jurors often can reach agreement.

When you continue your deliberations do not hesitate to rethink your own views and change your opinion if you decide it was wrong. However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what fellow jurors think or only for the sake of reaching a verdict.

The jury left the courtroom at 8:43 a.m. At 8:55 a.m., the jury send the court a note and asked to hear the testimony of MS, HS, and MM. Brooks's lawyer objected and renewed his motion for a mistrial because of a hung jury. He also urged the court to deny the request to hear MS's testimony as unreasonable because the jury had listened to her testimony the day before. The court disagreed, stating:

Well, first of all, this jury has been having a heck of a time and they came back this morning, and, then, they're going to try again.

So, this is the Constitution at its finest. They're rethinking, they want to listen to some testimony again, and I'm proud of them for it, and I'm going to let them.

So, I'm going to let them listen to [HS], [MM], and [MS]. I'm doing to— they're asking to hear the prosecutor questioning where she was talking about the alleged offense. I'm going to allow that. That's what the jury is asking for and that's what I'm going to let them hear.

The jury heard the requested testimony and resumed deliberations at 9:03 a.m. At 10:49 a.m., the jury returned a unanimous verdict. The jury was polled and each juror affirmed that it was their verdict.

When a jury indicates it cannot reach a unanimous verdict, a trial court may give a supplemental instruction to encourage the jury to continue deliberating. *People v Sullivan*, 392 Mich 324, 329; 220 NW2d 441 (1974.) The goal of such an instruction is to encourage further deliberation without coercing a verdict. *People v Hardin*, 421 Mich 296, 314; 365 NW2d 101 (1984). If the charge has the effect of forcing a juror to surrender an honest conviction, it is coercive and constitutes reversible error. *Sullivan*, 392 Mich at 334. In *Sullivan*, the Court adopted a standard deadlocked-jury instruction that has been incorporated into the model jury instructions. *Id*. at 341-342. The model instruction, M Crim JI 3.12, strikes the correct balance, but is not the only instruction that may properly be given. *People v Walker*, 504 Mich 267, 277-278; 934 NW2d 727 (2019). There is no claim of instructional error in this case. Brooks concedes that the trial court's instructions were not coercive, and our review of the court's instructions to the jury reveals that the court's instructions to the jury appropriately encouraged deliberation and were not unduly coercive.

Brooks nevertheless argues that the trial court's decision to instruct the jury to continue to deliberate after it stated that it was hung and was at an impasse was coercive. Brooks does not cite any authority in support of his argument that a trial court's decision to instruct to a jury to continue deliberating is coercive. He suggests that a court "cannot read the standard instruction indefinitely,

like a perpetual motion machine, without abusing its discretion and coercing a verdict." However, the trial court did not give the jury a deadlocked-jury instruction "indefinitely." The first deadlocked-jury instruction was given after the jury had deliberated for approximately one hour after rehearing the testimony of three witnesses. The second deadlocked-jury instruction was given after the jury had deliberated for an additional 20 minutes. The third deadlocked-jury instruction was given after the jury had deliberated for an approximately one additional hour. "Claims of coerced verdicts are reviewed on a case-by-case basis, and all of the facts and circumstances, as well as the particular language used by the trial judge, must be considered." *People v Malone*, 180 Mich App 347, 352; 447 NW2d 157 (1989). Based on the above record, we do not conclude that the jury was coerced into reaching a verdict.

## VIII. SENTENCING

### A. STANDARD OF REVIEW

Finally, Brooks argues that the trial court violated the principle of proportionality when it sentenced him to 50 to 75 years, despite his mandatory minimum sentence being only 25 years. He contends that the reasons provided by the trial court for exceeding the mandatory minimum sentence do not support the extent of the departure and that the sentence imposed is unreasonable.[9] Although the sentencing guidelines are no longer mandatory in Michigan, trial courts are still required to "consult the applicable guidelines range and take it into account when imposing a sentence." *People v Lockridge*, 498 Mich 358, 391-392; 870 NW2d 502 (2015). "A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Dixon-Bey*, 321 Mich App 490, 520; 909 NW2d 458 (2017) (quotation marks and citation omitted). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *Id*. (quotation marks and citation omitted; alteration in original). "A sentence is unreasonable—and therefore an abuse of discretion—if the trial court failed to adhere to the principle of proportionality in imposing its sentence on a defendant." *People v Lampe*, 327 Mich App 104, 125; 933 NW2d 314 (2019).

### B. ANALYSIS

"[T]he principle of proportionality . . . requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Walden*, 319 Mich App 344, 351; 901 NW2d 142 (2017) (quotation marks and citation

---

[9] In *People v Payne*, 304 Mich App 667, 672; 850 NW2d 601 (2014), this Court noted that "it is clear that the 'mandatory minimum' sentence in MCL 750.520b(2)(b) is a flat 25–year term for purposes of MCL 769.34(2)(a), and that any upward departure from this 25–year mandatory minimum must be supported by substantial and compelling reasons." Because the guidelines are now advisory, there is no longer a need to establish substantial and compelling reasons for a departure. *Lockridge*, 498 Mich at 364-365. Yet, *Payne* remains relevant on the point that a minimum sentence imposed by a court constitutes a departure if it exceeds a mandatory minimum sentence, such as the 25-year mandatory minimum in MCL 750.520b(2)(b), as well as exceeding the minimum sentence guidelines range. Accordingly, because the court in this case imposed a sentence in excess of 25 years, the sentence constitutes a departure sentence.

omitted). The trial court "must take into account the nature of the offense and the background of the offender," and courts may "depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Id*. (quotation marks and citation omitted). When applying the principle of proportionality, factors that may be considered by the trial court include, but are not limited to:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*Id*. at 352-253 (citation omitted).]

In the context of proportionality review, the legislative guidelines "serve as a 'useful tool' or 'guideposts' for effectively combating disparity in sentencing." *Dixon-Bey*, 321 Mich App at 524-525. For this reason, the trial court must "justify the sentence imposed in order to facilitate appellate review," including "an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *Id*. at 525 (quotation marks and citations omitted).

Here, the trial court gave a detailed explanation for the sentence it imposed. The court addressed Brooks's extensive criminal background dating back to 1986 and several factors not considered by prior record variables (PRVs). Brooks had a total of 11 convictions, nine of which were prior low severity felony convictions, over twice the maximum number of such convictions accounted for by PRV 2. The court explained that "because the guidelines do not consider the full scope of your criminal history, the Court finds that they are inadequate and disproportionate." As for the convictions accounted for by PRV 2, the court noted that the guidelines considered Brooks's prior convictions, but did not consider his multiple prison terms, his failed periods of probation, and violations of parole, nor the short period of time between his return to the community and subsequent offenses. The court found that the length of time that Brooks had most recently been out of prison "kind of breaks up that pattern" and that the court "considers that somewhat of a mitigating factor." The court also found, however, that Brooks's "persistent non-compliance with previous sentences is an aggravating factor not accounted for by the scoring guidelines, and that factor weighs quite heavily in the Court's consideration."

Brooks argues that the trial court's finding that the guidelines did not adequately account for his nine prior low severity felonies did not justify the extent of the departure in this case because his prior felonies demonstrated that he was a recidivist "car thief." However, it is plain that not all of Brooks's prior felonies were accounted for by the sentencing guidelines. Moreover, Brooks's past incarcerations did not deter him from continuing to engage in criminal behavior. Repeated failure to rehabilitate when given the opportunity is a valid factor in selecting a proportionate sentence. *People v Geno*, 261 Mich App 624, 636; 683 NW2d 687 (2004). Finally, notwithstanding Brooks's contention that he is merely a recidivist car thief, in the present case Brooks is not being sentenced for a car theft; he is being sentenced for first-degree criminal sexual conduct. When fashioning Brooks's sentence, the court properly considered the aspects of Brooks's prior history that were not accounted for by the sentencing guidelines.

Brooks next argues that the trial court improperly considered the uncharged offenses as a factor not adequately considered by the guidelines because the testimony of the other-acts witnesses was unreliable. The court considered Brooks's history of sexually assaultive conduct toward young girls and women dating back over 30 years. On the basis of the court's personal observation of the other-acts witnesses, it found the other-acts witnesses to be credible. The court recognized that the other acts were not the focal point of sentencing but that "[t]he guidelines don't account for those instances of conduct," which "suggest a pattern of assaultive crimes throughout your life that has escaped detection up to this point." The court concluded that the testimony suggested a pattern of undetected assaultive crimes that represented "credible predictors of future behavior." When scoring the guidelines, courts may rely on uncharged conduct using the preponderance of the evidence standard at sentencing. *People v Beck*, 504 Mich 605, 626; 939 NW2d 213 (2019). Here, the trial court did not rely on the other-acts conduct when scoring the guidelines. Rather, the court relied on the evidence of other acts in finding that the acts represented "credible predictors of future behavior," which is a valid consideration when fashioning a proportionate sentence. *People v Horn*, 279 Mich App 31, 45; 755 NW2d 212 (2008).[10]

Next, Brooks argues that the trial court erred by finding that the guidelines failed to account for the fact that he violated the trust of MS and her family by perpetrating the offense while living under the same roof as the victim. The trial court noted that this Court's decision in *People v Armstrong*, 247 Mich App 423, 425; 636 NW2d 785 (2001) recognized that the inability of the guidelines to capture this consideration is a legitimate reason to depart from the guidelines. Despite the holding in *Armstrong*, Brooks argues that OV 10 takes into consideration the violation of a trust relationship. He equates "predatory conduct" with violation of a trust relationship. His argument, however, is misplaced. Offense Variable 10 is exploitation of a vulnerable victim. MCL 777.40. The maximum score of 15 points may be scored when predatory conduct is involved. MCL 777.40(1)(a). "Predatory conduct" means preoffense conduct directed at a victim for the primary purpose of victimization. MCL 777.40(3)(a). Here, Brooks's predatory conduct was waiting until MS was asleep before assaulting her. That is different from what the trial court referenced in finding that Brooks violated the trust the victim's family placed in him by allowing him to live with the family and be around their child. This is different than the predatory nature of the act, and was properly considered by the court.

In explaining its rationale for imposing a sentence above the mandatory 25-year-minimum sentence, the trial court concluded that "a prolonged period of separation from society is justified" because "[a] lengthy term of incarceration will prevent you, Mr. Brooks, from committing future crimes, making this victim, and others like her, safe for the foreseeable future." The court also concluded that there was no likelihood of Brooks's rehabilitation considering that he failed to reform himself during his multiple prison sentences and instead reoffended shortly after his releases. The need to protect others is a factor not adequately considered by the guidelines. See *Armstrong*, 247 Mich App at 425. Although these factors were not directly challenged by Brooks, we conclude that the trial court properly considered Brooks's background, his inability to avoid

---

[10] Brooks argues that uncharged conduct should never been considered, and in support of his argument he cites authority related to *acquitted* conduct. This portion of his argument is misplaced because the present case does not involve acquitted conduct.

detection of his assaultive crimes, and the specific circumstances of this crime, and determined that a sentence above the guidelines range was appropriate in this case.

Finally, Brooks argues that the trial court's "methodology" in fashioning a sentence was flawed. He argues that the trial court sentenced him as though every one of the OVs was scored, even though they were not. This is not the case. Rather, the trial court translated the facts not considered by the guidelines and approximated where the guidelines would have been had the unaccounted-for facts been accounted for. The court determined that the unaccounted-for facts were the equivalent of a score of 85 points additional OV points, which would have placed the guidelines range at 225 months to 750 months. The court's statement was made to facilitate appellate review of the *extent* of the departure. By translating the departure factors into an OV score, the court was able to explain why the sentence it imposed was "more proportionate to the offense and the offender than a different sentence would have been." *Dixon-Bey*, 321 Mich App at 524-525 (quotation marks and citations omitted). "A sentence cannot be upheld when the connection between the reasons given for departure and the extent of the departure is unclear." *People v Smith*, 482 Mich 292, 304; 754 NW2d 284 (2008). The trial court is not required to use any precise words to justify a particular departure. *Id.* at 311. That the court in this case opted to link the facts unaccounted for by the guidelines to a hypothetical OV score and then impose a sentence within the guidelines range calculated using those otherwise unaccounted-for facts is an acceptable method for justifying the particular departure imposed.

Affirmed.

/s/ Brock A. Swartzle
/s/ Michael J. Kelly